Filed 1/23/25  D.B. v. Superior Court CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| D.B.,<br><br>          Petitioner,<br><br>v.<br><br>SUPERIOR COURT FOR CITY &<br>COUNTY OF SAN FRANCISCO,<br>          Respondent;<br><br>SAN FRANCISCO HUMAN<br>SERVICES AGENCY,<br>          Real Party in Interest. | A171845<br><br>(San Francisco<br>Super. Ct. No. JD233197) |

D.B. (father) petitions for extraordinary relief from the juvenile court's orders terminating reunification services and setting a hearing under Welfare and Institutions Code section 366.26[1] as to his son D.B. (D.B.). Father, who was incarcerated at the time of the orders, argues the juvenile court erred in reducing his visitation and denying his request to present evidence on whether increasing or maintaining his visits after his release from custody would be in D.B.'s best interest.  He also asks for a stay of the upcoming section 366.26 hearing on March 12, 2025.  We deny father's

---

[1]      Further statutory references are to the Welfare and Institutions Code unless otherwise stated.

1

petition and stay request.

## BACKGROUND

### Petition, Detention, Jurisdiction, and Disposition

According to the San Francisco Human Services Agency's (Agency) detention/jurisdiction report, D.B. (then just one-month old) and his half-brother (then six years old)[2] were placed in protective custody on June 6, 2023. Child protective services received reports that N.H., the children's mother (mother), had relapsed on drugs and that the family was living in unsanitary and unsafe conditions. Trash covered the family's apartment unit, and the bathroom walls were smeared with feces. Mother admitted she was " 'high out of her mind, lost her shit and went haywire.' " Father, who lived with the family, stated, " 'it had gotten too volatile' " living with mother and he " 'nee[ed] help' " with her. Father admitted he used speed and methamphetamines. He asked child protective services and the Agency to take D.B. away.

The alleged father of D.B.'s brother expressed that "this is the third time" that his son was removed from mother and that she was not able to care for him.

On June 6, the Agency filed a petition alleging mother and father failed to protect D.B. (§ 300, subd. (b)(1)), due to among other things the parents' substance abuse issues; mother's mental health issues; father's failure to protect D.B. from mother's neglect; and a separate dependency case involving D.B.'s brother, who, as a result of mother's substance abuse, had ingested methamphetamine and morphine and required hospitalization. The petition also alleged D.B. was at risk of abuse and neglect given mother's inability to

---

[2]   D.B.'s brother is the subject of a separate dependency case not at issue here.

care for D.B.'s brother.  (§ 300, subd. (j).)

On June 27, 28, and July 3, the juvenile court held the detention hearing.  The court ordered D.B. detained, granted father supervised in-person and virtual visits, and set a combined jurisdiction and disposition hearing for October 6.

On August 16, the Agency filed its disposition report.  Father stated he smoked cannabis every day and drank alcohol socially, but denied "historical substance abuse," contrary to statements he made earlier to the Agency. Father did not comply with random substance abuse screening.  He was on probation and had a criminal history.

The Agency further reported that D.B. had been placed with a non-relative extended family member and was doing well.  Father completed one in-person visit and was participating in at least two virtual visits per week. The Agency recommended reunification services for both parents.

On November 8, father's attorney filed an "Order to Show Cause and Affidavit for Contempt" against the Agency.  Counsel stated that father had been booked into custody at the county jail on August 31 and had not had any visits with D.B. since then.

On November 27, the Agency filed a response to the order to show cause detailing its efforts to set up visits between father and D.B. while father was in custody.  Between October 6 and November 20, a social worker for the Agency communicated back and forth with Gabriela Perez, the Agency's liaison to the One Family Program, a program with the county jail that provides supportive services to parents in custody.  Perez advised the social worker to apply for father to receive in-person visits, and the social worker did so.  The social worker also asked for father to receive virtual visits.

3

On November 27, the court denied the order to show cause. It ordered that father receive, "as allowed by San Francisco County Jail protocol," a minimum of two 30-minute supervised virtual visits per week and two supervised in-person visits per month. This remained the visitation arrangement up to the six-month review hearing one year later.

On December 14, the Agency filed an addendum to the disposition report. Perez reported she could only facilitate one virtual visit per week, despite the social worker notifying her that the court's standing visitation order required at least two visits per week. On December 5, father had a virtual visit with D.B. that went well.

On December 21, the court held the jurisdiction hearing. Mother and father agreed to submit on the jurisdiction issue, in return for an amendment to the petition. The sustained allegations of the amended petition against father were that he "is currently incarcerated on several felony charges, has a history of substance abuse problems which affects his ability to protect and properly care for the minor, which place the minor at risk of emotional and physical harm." The court continued father's visitation as previously ordered and continued the disposition hearing to March 7, 2024.

On March 1, the Agency filed another addendum to the disposition report. Father was still incarcerated. The Agency noted that father recently had been convicted of various charges, including several burglary counts, and was sentenced to a total term of three years. The Agency reported that father had "been given credit for time served, but will likely remain in custody for at least another 1.5 years."

Father continued to have weekly virtual visits with D.B. under Perez's supervision. Perez reported the visits went well, but that "understandably due to the child's age, the visit duration range[d] from 15 minutes [to] 45

4

minutes."

The Agency recommended continuing reunification services for mother, but bypassing services for father. It cited father's lack of a "significant degree of bonding with his son, who was removed from his care . . . when he was a month old." The Agency also stated, "Given the length of his sentence and it is unlikely that the father will be discharge [*sic*] before the applicable time limitations for reunification services with a newborn baby. Therefore, the Agency does not believe it would be in baby [D.B.'s] best interest."

On March 7, father filed a waiver of reunification services. After several continuances, the juvenile court held the disposition hearing on March 21. Mother submitted to the Agency's recommendations. The court accepted father's waiver of reunification services. It then declared D.B. a dependent, removed D.B. from parental custody, and ordered reunification services for mother. The court's written order did not reference father's visitation.

**Six-Month Review Hearing**

In advance of the six-month review hearing then set for September 17, the Agency filed a status review report, which was authored by social worker Monica Ternullo. D.B.'s substitute care provider reported concerns about his "lack of language and communication skills." At 16 months old, D.B. was not responding to his name or mimicking words or sounds. He exhibited hand-flipping and hyper-fixation, which were associated with autism spectrum disorder. The substitute care provider was having D.B. assessed for possible auditory issues. In addition, the Agency was seeking a referral to the regional center, which provides services to persons with development disabilities. (See §§ 4512, subds. (a) & (b), 4642, subd. (a).)

Father was still incarcerated. He participated in weekly video visits. Father also received in-person visits when available at the jail. At that point,

5

he had three in-person visits in jail. Feedback from jail staff was positive. The Agency recommended to maintain this visitation arrangement "until further notice . . . ."

The Agency also recommended that the court terminate reunification services for mother and set a permanency planning hearing under section 366.26.

The contested six-month review hearing ultimately took place over the course of two days, on November 25 and 27. The court heard testimony from various witnesses, including social worker Ternullo.

Regarding father's visitation while in custody, Ternullo testified that virtual visits occurred at least once per week, but that in-person visits occurred sporadically. Ternullo testified that "if something happens within the jail, they will cancel a visit." The jail did not allow Ternullo to attend in-person visits, and so she had not observed the visits that did occur. She received information about father's visits with D.B. from Perez, as well as D.B.'s substitute care provider.

Ternullo related Perez's reports that the visits have been positive. But the substitute care provider, who supervised the virtual visits, reported that "in some respect she feels like it is a hassle or somewhat of a waste of time because [D.B.] doesn't really understand what is going on." Ternullo testified that D.B. possibly had auditory issues or autism spectrum disorder, and was in the process of being assessed for both.

Ternullo recommended that the court terminate services for mother, and that the visits for both mother and father be modified to one supervised visit per month. When asked whether she had considered what visitation would look like if father was released soon, Ternullo testified she would maintain supervised visits once per month. This was because the Agency's

6

plan at that point for D.B. was permanency, not reunification. Ternullo also testified that limiting visits to once per month would avoid hardship for D.B. and the caregiver.

During the hearing, father's attorney sought to present testimony from father and Perez. When the court asked for an offer of proof, counsel stated that father would testify "about the safety and the quality and the nature of visitation" with D.B. Counsel stated that Perez would testify as an impeachment witness, to contradict social worker Ternullo's testimony regarding D.B.'s ability to react to father and the amount and quality of visitation.

The court asked counsel when father would be released from custody and whether she was seeking a ruling "concerning the visits while [father] is incarcerated." Counsel responded that father "should be released sometime between I think January 11 and 18th." And she stated she was seeking an order setting forth a visitation arrangement for when father is released. The court responded, "I am not going to do that because we don't know if and when he is going to be released. . . . [U]nless we have a court order saying that he is going to be out during that week, we will revisit that issue at the appropriate time. [¶] I think the order that I need to make today is regarding the visits that are happening while he is incarcerated . . . ."

Counsel for the Agency weighed in on the matter, stating, "The visits that are currently happening we are asking to keep the same." If father is released, the Agency would need to reevaluate and assess father to determine the appropriate level of visits. Counsel also stated that if and when father is released, he could file a section 388 motion to modify the existing visitation

7

order.[3]

When father's counsel offered to have Perez testify as to the release date, the court stated, "[U]nless you have got a court order telling me his release and you can show that to me, there is no point in dealing with that until his release date. [¶] . . . I am open to an ex parte, which can be decided the day after you notice it. Father then told the court that he would be released on "February 8."[4] The court replied, "I don't have anything in front of me telling what the exact release date is. [¶] But what I am saying very clearly is that I will revisit it as soon as [father] is out. This happens all the time in cases. Parents are incarcerated. We deal with the visitation order while they are incarcerated, they get out, and we deal with the visitation order when they get out. That is the way we are going to handle this. [¶] So I appreciate all the intel but I am not going to deal with the fiction at this point. As soon as it happens, come back, and we will deal with it."

At father's counsel's request, however, the court ordered the Agency to interview and assess father right away to avoid any delay once he is released. The court then declined the request to allow father and Perez to testify.

Father's counsel revisited the issue in closing argument. She argued that waiting until father was released before filing an ex parte application to change the visitation order would cause unnecessary delay. Counsel added that the court should issue an order providing that once released, father should have monitored visits in the community three times per month, each

---

[3]     Section 388 states, in pertinent part: "Any parent . . . may, upon grounds of change of circumstance or new evidence, petition the court . . . to change, modify, or set aside any order of court previously made . . . ." (§ 388, subd. (a)(1).)

[4]     Neither father nor his counsel specified the year for the days that each claimed was father's release date.

for four hours, as opposed to the supervised visits he had in jail.

The court interjected, stating: "You keep saying . . . that the Court does not have information. The Court is willing to assume everything you are saying is true. It is not that I don't have information. It is that your client is incarcerated, and there is no more that the Court could do other than affirm the existing visitation order. [¶] So we do not know when your client is getting out. Your client thinks he knows. Until your client gets out, it is not reasonable to ask for an incredibly specific visitation order until I know when he is out, what he is doing, where he is living, what his availability is, and that can only be assessed when he is out, so that is the reason the Court disallowed unnecessary testimony information. The Court has more than what it needs to make its order today with respect to your client."

Following closing arguments, the court announced its rulings. It terminated reunification services for mother, continued D.B.'s placement with his caregiver, and set a section 366.26 hearing for March 12, 2025. Regarding father's visitation, the court stated, "If and when he is released from jail, the Court will consider a visitation order as appropriate then. For now the current order stays in place with respect to [father]."

After announcing its rulings, father's counsel asked for clarification of the visitation order:

"[Father's counsel]: Your Honor, can I just be clear? Although the Court is not changing the visitation order, if he were released, he would be getting the same visitation that he is getting now, just supervised at the department and that the social worker will interview the father so that she is prepared to put this on calendar to make a recommendation.

"[Agency's counsel]: The agency—the testimony was that it should be once a month for all parties supervised. That was the testimony.

9

"[Father's counsel]: Father is requesting no change in the frequency of his visitation.

"THE COURT: Here is what I am going to say. I am going to say it will be what the agency is requesting for [father] but subject to assessment, so it will be once a month, but the agency should assess and figure things out. [¶] . . . [¶]

". . . I have no idea when your client is getting out, so I appreciate that you want a fictional order that hopefully would be put into place, but I cannot operate in that universe, so go ahead you can make your record.

"[Father's counsel]: I was just going to renew my objection that the Court has now reduced the father's current visitation without allowing any evidence by the father as to why the visitation should remain the same as it is at the very least. . . .

"THE COURT: Your client is incarcerated. I am giving him the maximum available while he is incarcerated, and when he is out, we will deal with it then."

The court turned to a request regarding mother's visitation. It then stated: "I think we need to see what the lay of the land is once [father] gets out and how both Mom and Dad are doing. This is typically the order that goes along unfortunately with a .26 ruling and in the future.

"So I am going to go ahead and reduce it to one time a month supervised, and again, if there is new information, other information . . . . [¶] I invite the parties to make whatever motion they want to before me with new information that [father] is out, sober, and he is doing great, and if [mother] maintains her sobriety, then I will reconsider visitation. That is

10

fine with me, but for now this is the Court's ruling."[5]

The court's minute order entered on November 27 states that father was to receive supervised visits two times per month "in person while incarcerated" and "supervised weekly virtual visits . . . [to] occur as the jail permits." The order also states, "The Agency is ordered to assess [father] and his visits forthwith so that there is not a delay if a motion re: visits is filed." The order further provides, "the court invited counsel to file the appropriate motion upon [father's] release and the court will reconsider visitation if and when [father] is released and demonstrates maintain his sobriety. [Father] to receive supervised visits 1x month when he is released subject to Agency's assessment."

_____

[5] The court's oral rulings at the conclusion of the hearing are somewhat ambiguous. In response to father's counsel's question regarding whether father "would be getting the same visitation that he is getting now" "if he were released," the court stated, "it will be once a month." This exchange appears to indicate that the court maintained the current visitation arrangement while father remained incarcerated, but reduced his visits once he is released from jail. However, the court's subsequent comments—"I am giving him the maximum available while he is incarcerated, and when he is out, we will deal with it then" and "I am going to . . . reduce it to one time a month supervised, and again, if there is new information, other information . . . [,] then I will reconsider visitation"—could be interpreted as the court reducing father's current visitation while in jail, while declining to issue altogether any preemptive order for when father is released in the future. To the extent there is ambiguity in the court's oral rulings, however, we conclude the minute order entered on November 27 remedied the ambiguity. (See *In re Byron B.* (2004) 119 Cal.App.4th 1013, 1018 ["[T]he clerk's minutes and the reporter's transcript are to be harmonized, if possible. [Citation.] In this case, the clerk's transcript simply clarifies a point that the reporter's transcript left ambiguous."].) Thus, "[w]e conclude that the minute order correctly recites the juvenile court's ruling." (*Ibid.*)

11

## DISCUSSION

In these writ proceedings, father solely challenges the visitation order. As stated in a heading in his petition, his arguments are that "The Court Erred By Reducing [His] Visitation, Denying His Request to Present Evidence, and Shifting the Burden to Him to Bring the Issue Back Before the Court."

### General Legal Principles and Standard of Review

The stage of the dependency proceeding greatly affects the priority placed on a parent's visitation rights. During reunification, visitation is "essential." (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 972.) Reunification services must provide for "visitation between the parent or guardian and the child," and the visitation must be "as frequent as possible" while protecting the safety of the child. (§ 362.1, subds. (a)(1)(A)–(B).) Where, as here, "reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) "After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)

"We review an order setting visitation terms for abuse of discretion." (*In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1356.) To the extent father challenges the court's evidentiary rulings, including on the admissibility of evidence, we also review such rulings for abuse of discretion. (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1135.) "The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711.) The trial court's factual findings are reviewed for substantial evidence; its conclusions of law are reviewed de novo; and its application of the law to the facts is reversible only if it is 'arbitrary and

12

capricious' (*id.* at pp. 711–712) or ' " ' " 'patently absurd,' " ' " ' meaning that ' " ' " 'no judge could reasonably have made the order' " ' " ' in question. (*In re Caden C.* (2021) 11 Cal.5th 614, 641.)" (*In re P.S.* (2024) 107 Cal.App.5th 541, 553.)

Moreover, we presume the juvenile court's order is correct, and father as the petitioner has the burden to overcome that presumption and affirmatively show error. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564; *In re S.C.* (2006) 138 Cal.App.4th 396, 408 (*S.C.*).)

**The Juvenile Court's Visitation Order Was Not An Abuse of Discretion**

Father first argues, "the Court's final order was to maintain his current visitation, and reduce his time upon his release. The Court made this order in deference the [*sic*] [Agency's] recommendation. Nothing in the record supports this recommendation . . . ." But father fails to support this claim with any cogent legal argument. "To demonstrate error, [petitioner] must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error. [Citations.] When a point is asserted without argument and authority for the proposition, 'it is deemed to be without foundation and requires no discussion by the reviewing court.' [Citations.] Hence, conclusory claims of error will fail." (*S.C.*, *supra*, 138 Cal.App.4th at p. 408; accord, *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 (*Cahill*) [" 'We are not bound to develop appellants' arguments for them. [Citation.] The absence of cogent legal argument or citation to authority allows this court to treat the contention as waived.' "].) We thus treat father's claim as forfeited.

But even if not forfeited, the claim of insufficient evidence is unavailing. Contrary to father's assertion, the record supports the visitation order. At the six-month review hearing, the Agency recommended that the

13

court terminate reunification services and set a hearing on selection and implementation of a permanent plan under section 366.26, that is, a hearing at which parental rights potentially would be terminated.  As father acknowledges, the social worker testified that supervised monthly visits would be appropriate for both parents, because the plan for D.B. at that point, if adopted by the court, would no longer be reunification.  To that end, she believed that limiting the frequency of the parents' visitation would avoid hardship for both D.B. and his caregiver.

Further, the court's adoption of the Agency's visitation recommendation is consistent with the dependency law's recognition that where, as here, "reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability" (*In re Marilyn H.*, *supra*, 5 Cal.4th at p. 309) and thus, "the parents' interest in the care, custody and companionship of the child are no longer paramount." (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317.)  In accordance with these principles, the court fashioned a visitation order that prioritized D.B.'s interest in permanency and stability over father's visitation rights.

Father also faults the court for not allowing him to "present evidence to show that maintaining or increasing visitation upon his release would be in the child's interest."  This is yet another conclusory argument.  Father makes no attempt to specify the evidence to which he refers, much less articulate how such evidence would have shown that "maintaining or increasing visitation upon his release would be in the child's interest."  By failing to develop his argument in any meaningful way, father has forfeited it.  (See *Cahill, supra,* 194 Cal.App.4th at p. 956; *In re S.C.*, *supra*, 138 Cal.App.4th at p. 408.)  Accordingly, father has failed to show the court abused its discretion in denying his request to present his proffered evidence.

But assuming for argument's sake that father did not forfeit his claim, and that the court's ruling constituted an abuse of discretion, father has not met his burden to show resulting prejudice. (See *In re M.S.* (2019) 41 Cal.App.5th 568, 590 ["In general, harmless error analysis applies in juvenile dependency proceedings even where the error violates constitutional rights. . . ."], disapproved on another ground in *Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 631, fn. 8; see also *In re N.V.* (2010) 189 Cal.App.4th 25, 31 [even if the juvenile court abuses its discretion by excluding evidence, this does not necessarily mandate reversal].)

As mentioned, father sought to present his own testimony, as well as that of the Agency's jail liaison, Gabriela Perez. When asked for an offer of proof as to the substance of the testimony, father's counsel stated that father would "testify about the safety and the quality and the nature of visitation." Perez would testify as an impeachment witness, to contradict the social worker's testimony regarding D.B.'s ability to react to father, and regarding the amount and quality of visitation. Assuming that the court should have allowed these witnesses to testify, it is not reasonably probable that it would have granted father's request to maintain or increase his visits upon his release from custody. (See *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); *In re Celine R.* (2003) 31 Cal.4th 45, 59–60 [applying harmless error test of *Watson* to dependency matters]; see also *In re R.F.* (2021) 71 Cal.App.5th 459, 474 [*Watson* test applies to errors that are not structural].) The court made clear it was not inclined to grant father's request to maintain or increase the frequency of his visits upon his release, unless and until the court had specific information about father's circumstances after his release. As the court put it, it needed evidence that "[father] is out, sober, and he is doing great." Father's offer of proof did not

15

(and arguably could not) address facts such as "what he [would be] doing" upon release, where he would be living then, his availability, or whether or how he would maintain his sobriety. Therefore, on this record, any perceived error in not allowing father or Perez to testify does not require reversal of the visitation order.

Father next claims "the Court attempted to mitigate the error by allowing [him] to bring an ex parte request upon his release for increased visits, but this impermissibly places the burden on him to show cause as to why the Court should modify its previous order." But father did not raise this claim below. Not only that, father did not dispute the Agency's and the court's determination that should any party wish to revisit the issue of visitation after father's release, an appropriate vehicle by which to do so would be to file a section 388 petition with evidence of changed circumstances. Father's failure to raise this argument below precludes him from raising it now. (See *In re Aaron B.* (1996) 46 Cal.App.4th 843, 846 [" '[A] party is precluded from urging on appeal any point not raised in the trial court. . . .' "].) But even if not forfeited on that basis, his claim is forfeited for the separate reason that he fails to support it with cogent argument and legal authority. (See *Cahill*, *supra*, 194 Cal.App.4th at p. 956; *In re S.C.*, *supra*, 138 Cal.App.4th at p. 408.) Although we may exercise our discretion to consider arguments for which we can discern a legal or factual basis in father's petition (and we have done so as to his other perfunctory claims), the nature and scope of this particular claim regarding burden-shifting is vague. We decline to speculate about which issues father intends to raise and thus disregard his argument.

Finally, father argues that the court "should have ordered an interim hearing on or about February 8 to determine an appropriate visitation order."

16

However, father did not ask the court to hold such an interim hearing. Thus, the contention is waived. (See *In re Cheryl E.* (1984) 161 Cal.App.3d 587, 603 ["A party on appeal cannot successfully complain because the trial court failed to do something which it was not asked to do."].)

In sum, father has failed to meet his burden of showing the court's visitation order was an abuse of discretion.[6]

## DISPOSITION

Father's writ petition is denied on its merits. His request for a stay of the upcoming section 366.26 hearing on March 12, 2025 is denied. Our decision is final as to this court immediately. (Cal. Rules of Court, rule 8.490(b)(2)(A).)

---

[6] The Agency raises several alternative arguments in support of the visitation order, including that father was not entitled to visitation as a matter of right and that his failure to satisfy the requirements of section 388 at the six-month review hearing justified the denial of his requested visitation order. As noted, it is father who bears the burden to affirmatively show error; it is not the Agency that must show the order was correct. And because we have concluded father has not met his burden, we need not address the Agency's additional arguments.

_____

RICHMAN, J.

We concur.


_____

STEWART,  P. J.


_____

MILLER, J.


*(D.B. v. Superior Court A171845)*